**ROBERT H. REXRODE, III**
California State Bar No. 230024
427 C Street, Suite 300
San Diego, California 92101
Telephone: (619) 233-3169, Ext. 13
Facsimile: (619) 684-3553
robert_rexrode@rexrodelawoffices.com

Attorneys for Mr. Carlos Estrada-Jimenez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(**HONORABLE JANIS L. SAMMARTINO**)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>CARLOS ESTRADA-JIMENEZ,<br>Defendant. | CASE NO. 07cr3209-DLS<br><br>STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTIONS. |

# I.

# FACTUAL HISTORY[1]

On August 24, 2007, immigration officers arrested Mr. Estrada-Jimenez just east of the San Ysidro Port of Entry. They did so suspecting that Mr. Estrada-Jimenez was in the country illegally. When first contacted by agents, Mr. Estrada-Jimenez gave inculpatory statements to agents. Later, during a formal interrogation, Mr. Estrada-Jimenez again made inculpatory statements to agents.

On November 28, 2007, before the January 2007 Grand Jury, the government indicted Mr. Estrada-Jimenez on one count of being a non-citizen in the United States after having been deported, in violation of 8 U.S.C. § 1326.

//

[1]The following facts are based on information provided by the government. Mr. Estrada-Jimenez does not admit their accuracy and reserves the right to challenge them.

## II.

## MOTION COMPEL DISCOVERY

Mr. Estrada-Jimenez requests the following discovery. His request is not limited to those items that the prosecutor knows of. It includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." *See United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989).

(1) Brady Information. The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case. Under *Brady v. Maryland*, 373 U.S. 83 (1963), impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. *United States v. Bagley*, 473 U.S. 667 (1985); *United States v. Agurs*, 427 U.S. 97 (1976).

(2) Any Proposed 404(b) Evidence. The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1) and Fed. R. Evid. 404(b) and any prior convictions which would be used to impeach as noted in Fed. R. Crim. P. 609. In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. The defendant requests notice two weeks before trial to give the defense time to investigate and prepare for trial.

(3) Request for Preservation of Evidence. The defendant requests the preservation of all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest in this case. This request includes, but is not limited to, the results of any fingerprint analysis, the defendant's personal effects, and any evidence seized from the defendant or any third party.

(4) Defendant's Statements. The defendant requests disclosure and production of all statements made by the defendant. This request includes, but is not limited to, the substance of any oral statement made by the defendant, Fed. R. Crim. P. 16(a)(1)(A), and any written or recorded statement made by the defendant. Fed. R. Crim. P. 16(a)(1)(B)(i)-(iii).

(5) Tangible Objects. The defendant seeks to inspect and copy as well as test, if necessary, all other documents and tangible objects, including photographs, books, papers, documents, alleged narcotics, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to the defendant. Fed. R. Crim. P. 16(a)(1)(E). **This request specifically incorporates a request for a copy of Mr. Estrada-Jimenez's "A-File" and any tapes of any deportation hearing involving Mr. Estrada-Jimenez.**

(6) Expert Witnesses. The defendant requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case in chief. Fed. R. Crim. P. 16(a)(1)(G).

(7) Witness Addresses. The defendant requests access to the government's witnesses. Thus, counsel requests a witness list and contact phone numbers for each prospective government witness. Counsel also requests the names and contact numbers for witnesses to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as government witnesses.

(8) Jencks Act Material. Mr. Estrada-Jimenez requests production in advance of trial of material discoverable under the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid needless delays at pretrial hearings and at trial. This request includes any "rough" notes taken by the agents in this case. This request also includes production of transcripts of the testimony of any witness before the grand jury. *See* 18 U.S.C. § 3500(e)(1)-(3).

(9) Informants and Cooperating Witnesses. Mr. Estrada-Jimenez requests disclosure of the name(s), address(es), and location(s) of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Estrada-Jimenez. *Roviaro v. United States*, 353 U.S. 52, 61-62 (1957). The government must disclose any information derived from informants which exculpates or tends to exculpate Mr. Estrada-Jimenez. *Brady v. Maryland*, 373 U.S. 83 (1963). The government must disclose any information indicating bias on the part of any informant or cooperating witness. *Id.*

(10) Residual Request. Mr. Estrada-Jimenez intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.

**III.**

**MOTION TO DISMISS INDICTMENT DUE TO MISINSTRUCTION**

**A. Introduction**

The indictment in this case was returned by the January 2007 grand jury. That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007. *See Reporter's Partial Transcript of the Proceedings*, dated January 11, 2007.[2] Judge Burns' instructions deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[3]

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, *see* Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." *See id.* at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to

---

[2]The following motion has been litigated extensively in this district. District Judge Barry Ted Moskowitz entered a written decision on this motion in *United States v. Martinez-Covvarrubias*, No. 07cr0491-BTM. Given the size of the transcripts under consideration, and as both the government and the Court likely have these transcripts, Mr. Estrada-Jimenez has **not** attached either of the two transcripts he cites to in this motion. The first transcript referred to is the *Reporter's Partial Transcript of the Proceedings*, dated January 11, 2007. Mr. Estrada-Jimenez refers to this transcript as "Exhibit A" throughout this motion. The second transcript cited to by Mr. Estrada-Jimenez is the *Partially redacted, transcripts of the grand jury impanelment proceedings*. Mr. Estrada-Jimenez refers to this transcript as "Exhibit B" throughout this motion. If the Court prefers, Mr. Estrada-Jimenez is happy to provide a copy of these transcripts.

[3] *See, e.g.*, *United States v. Cortez-Rivera*, 454 F.3d 1038 (9th Cir. 2006); *United States v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir.) (en banc), *cert. denied*, 126 S. Ct. 736 (2005) (*Navarro-Vargas II*); *United States v. Navarro-Vargas*, 367 F.3d 896 (9th Cir. 2004)(*Navarro-Vargas I*); *United States v. Marcucci*, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[4] *See also id.* at 20 ("You're all about probable cause.").

say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" *See id.* at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which he excused three potential jurors. *See id.* at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

*Id.* That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect to their disagreement with Congress. *See id.* at 8-9. Thus, Judge Burns not only instructed the grand jurors on his view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

For example, in one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

*See* Exhibit B at 8.[5] In this passage, Judge Burns twice uses the term "should" in a context that makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing are Judge Burns' interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was

---

[5] *Please see* footnote 2, *supra*.

probable cause. Because of the redactions of the grand jurors' names, Mr. Estrada-Jimenez will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. *See id.* at 16. The CSW was also troubled by certain unspecified immigration cases. *See id.*

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, he provided instructions suggesting that, in any event, any scruples LCW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

*See id.* at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," *see id.* at 17, but in which there was probable cause. *See id.* Such a case "should go forward." *See id.* Given that blanket proscription on grand juror discretion, made manifest by Judge Burns' use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." *See id.* Again, Judge Burns' question provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange

with REA. REA first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." *See id.* at 24. Judge Burns first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. ...

*Id.* at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases. *See id.* at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." *See id.* That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

*Id.* at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

> The Court: do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?

> REA: Yes.
> The Court: I appreciate your answers. I'll excuse you at this time.

*Id.* at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," *see id.*, as it should. Because REA's vote "depend[s] on the case," *see id.*, it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause.[6] Again, Judge Burns made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward." *See id.* at 27. That is why even the "chance," *see id.*, that a grand juror might not vote to indict was too great a risk to run.

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. *See id.* at 20.[7]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

*Id.* (emphasis added).[8] The district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." *See id.* at 27.

---

[6] That fact belies the government's claim that Judge Burns excused only prospective jurors who "expressed inability to apply the laws passed by Congress." *See* Exhibit B at 8.

[7] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.

[8] The "in most instances" language suggests that there may be some limit on this principle. Again, counsel has ordered the full transcript, and it will likely resolve the question posed in the instant footnote.

In the general instructions, Judge Burns posits a duty on the part of the prosecutor to present to the grand jurors evidence that tended to undercut probable cause. *See* Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.

*Id.* The antecedent to this instruction is also found in the impanelment. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," *see* Exhibit B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." *See id.* Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." *See id.*[9]

**B. Argument**

**i. Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. *See Navarro-Vargas II*, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[10] to the problems posed by the instructions, endorsed many

---

[9] The impanelment instructions go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Exhibit B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." *See id.* at 43. *See also id.* at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

[10] *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in *Navarro-Vargas II*.

For instance, with respect to the grand jury's relationship with the prosecution, the *Navarro-Vargas II* majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" *Navarro-Vargas II*, 408 F.3d at 1200 (quoting *Butz v. Economou*, 438 U.S. 478, 510 (1978)). *Accord Navarro-Vargas I*, 367 F.3d at 900 (Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ). *See also Navarro-Vargas II*, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, *id.*, but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." *Id.* *See* Niki Kuckes, *The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury*, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., *Criminal Procedure* § 15.2(g) (2d ed. 1999)).

Indeed, the *Navarro-Vargas II* majority agrees that the grand jury possesses all the attributes set forth in *Vasquez v. Hillery*, 474 U.S. 254 (1986). *See id.*

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

*Id.* (quoting *Vasquez*, 474 U.S. at 263). The Supreme Court has itself reaffirmed *Vasquez*'s description of the grand jury's attributes in *Campbell v. Louisiana*, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." *Id.* at 399 (citing *Vasquez*, 474 U.S. at 263).

Judge Hawkins notes that the *Navarro-Vargas II* majority accepts the major premise of *Vasquez*: "the majority agrees that a grand jury has the power to refuse to indict someone even when

the prosecutor has established probable cause that this individual has committed a crime." *See id.* at 1214 (Hawkins, J. dissenting). *Accord Navarro-Vargas I*, 367 F.3d at 899 (Kozinski, J., dissenting); *Marcucci*, 299 F.3d at 1166-73 (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit. But not in Judge Burns' instructions.

**ii. The Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

The *Navarro-Vargas II* majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in *Marcucci*. *Marcucci* reasoned that the instructions do not mandate that grand jurors indict upon every finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out. *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). *See also id.* ("The 'word' should is used to express a duty [or] obligation.") (quoting *The Oxford American Diction and Language Guide* 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." *See* Ex. A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." *Vasquez*, 474 U.S. at 264.

Nor does the *Navarro-Vargas II* majority's faith in the structure of the grand jury a cure for the instructions excesses. The *Navarro-Vargas II* majority attributes "[t]he grand jury's discretion --

its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent." *Id.* at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." *See id.* at 1214 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." *Id.* After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" *Id.* (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in *Vasquez*. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." *Id.*

In setting forth Judge Hawkins' views, Mr. Estrada-Jimenez understands that this Court may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in *Vasquez*, *Campbell*, and both *Navarro-Vargas II* opinions. *Navarro-Vargas II* is distinguishable on that basis, but not only that.

Judge Burns did not limit himself to denying the grand jurors the power that *Vasquez* plainly states they enjoy. He also apparently excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." *See* Ex. A at 8. The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed

their willingness to act as the conscience of the community. *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under *Vasquez* "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting *Gaither v. United States*, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," *United States v. Williams*, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned his own rules and enforced them. The instructions here are therefore structural error. *See Navarro-Vargas II*, 408 at 1216-17 (Hawkins, J., dissenting). The indictment must be dismissed.

**iii. The Instructions Conflict With *Williams*' Holding that there Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

In *Williams*, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law. *See* 504 U.S. at 45, 51. *Williams* held that "as a general matter at least, no such 'supervisory' judicial authority exists." *See id.* at 47. Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" *id.* at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." *Id.* at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure." *Id.* at 50. As a consequence, *Williams* rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law. *See id.* at 51-55.

Despite the holding in *Williams*, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. *See* Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's

> incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

*Id.* (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." *See id.* at 27.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that *Navarro-Vargas II* somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." *See* Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." *See id.* Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." *See id.* at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1) I have to consider evidence that undercuts probable cause.

(2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3) Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions therefore discourage investigation–if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time–and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

**IV.**

**MOTION TO DISMISS INDICTMENT FOR FAILURE TO ALLEGE ELEMENTS**

**A. Introduction**

The indictment must be dismissed because the government has failed to properly allege all elements of the offense. The Fifth Amendment requires that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . .." Consistent with this Constitutional requirement, the Supreme Court has held that an indictment must "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." United States v. Carll, 105 U.S. 611, 612-13 (1881) (emphasis added). It is black letter law that an indictment that does not allege an element of an offense, even an implied element, is defective, and should be dismissed. See, e.g., Russell v. United States, 369 U.S. 749, 769-72 (1962); Stirone v. United States, 361 U.S. 212, 218-19 (1960); United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999); United States v. Keith, 605 F.2d 462, 464 (9th Cir. 1979).

First, the indictment fails to allege the following elements necessary to convict Mr. Estrada-Jimenez of the offense: that Mr. Estrada-Jimenez knew he was in the United States, he failed to undergo inspection and admission by an immigration officer at the nearest inspection point, and that he voluntarily entered the United States. As a consequence, it must be dismissed. See e.g., Nyrienda v. I.N.S., 279 F.3d 620 (8th Cir. 2002) (setting forth the components of an entry under the

immigration law); see also United States v. Pernillo-Fuentes, 252 F.3d 1030 (9th Cir. 2001); United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999).[11]

Second, the indictment charges a violation of Title 8, United States Code, Sections 1326(a) and (b). In United States v. Salazar-Lopez, __ F.3d __, 2007 WL 3085906 at *2 (9th Cir. Oct. 24, 2007), the Ninth Circuit indicated that to be sufficient, an indictment charging a violation of section 1326(b) must allege either that the defendant has been previously removed subsequent to a conviction (*i.e.,* for a misdemeanor, a felony, an aggravated felony, or a crime of violence), or it must allege a specific date of the prior removal. In this case, the indictment only alleges that Mr. Estrada-Jimenez "was removed from the United States subsequent to April 2, 1992." The indictment does not allege either that this removal occurred subsequent to a conviction or allege a specific date of the prior removal. Therefore, because the indictment does not allege all elements of section 1326(b), the indictment must be dismissed.

Last, the indictment, although purportedly alleging a violation of sub-section (b) of section 1326, does not allege that Mr. Estrada-Jimenez has suffered a prior conviction.

**B. Failure to allege knowledge**

Being "found in" the United States after deportation is a general intent crime. This means that the government must prove the defendant knew "the facts that make his actions illegal, but not that the action itself is illegal." United States v. Salazar-Gonzalez, 458 F.3d 851, 855 (9th Cir. 2006). Both the Supreme Court and the Ninth Circuit have made clear that the intent general knowledge requirement extends to both the proscribed act (*i.e.*, entering and remaining in the United States) and the facts that make the act illegal (being an alien). C.f. Staples v. United States, 511 U.S. 600 (1994) (holding that a federal firearms statute requires proof that the defendant knowingly possessed a firearm and that he knew the weapon he possessed had characteristics bringing it within the scope of the statute.); United States v. Lynch, 233 F.3d 1139 (9th Cir. 2000)(Provision of Archeological

[11] Most of these issues were decided against Mr. Estrada-Jimenez in United States v. Rivera-Sillas, 376 F.3d 887 (9th Cir. 2004). However, these issues remain open in the Supreme Court. To reserve these issues for further review, Mr. Estrada-Jimenez incorporates the arguments made by the defendant in Rivera-Sillas. If the Court wants full briefing on these issues, Mr. Estrada-Jimenez will provide it.

Resources Protection Act imposing criminal liability for removing archeological resources from government land requires that defendant knew that item intentionally removed was "archeological resource.").

The Ninth Circuit recently reiterated that 8 U.S.C. §1326 requires that the defendant know the essential facts making his presence in the United States illegal. In Salazar Gonzalez, 458 F.3d at 858, the panel held that the district court erred when it failed to instruct the jury that the defendant could not be convicted unless the government proved he knew he was in the United States. Id. at 858. Because "knowledge" was an essential element of the offense of being "found in" the United States after deportation, id. at 857, the defendant was entitled to a knowledge instruction, even without presenting any evidence himself.

The Ninth Circuit's reasoning is even more compelling when applied to the defendant's knowledge of his alienage. Because alienage is *the* fact that makes Mr. Estrada-Jimenez's remaining in the United States illegal, he must know that fact to be guilty of the general intent crime charged. This is true even though he need not have had the specific purpose to violate U.S. immigration laws. As an essential element of the crime, knowledge of alienage must be specifically alleged in the in the indictment. Because the indictment here alleges no *mens rea* at all, to assure that all facts necessary to convict him were"presented to...the grand jury that indicted him," the charges against Mr. Estrada-Jimenez must be dismissed.

The Ninth Circuit's decision in Rivera-Sillas, is not to the contrary. In that case, the Ninth Circuit rejected the argument that the district court erred by refusing to dismiss an indictment because it that did not allege the defendant knew he was in the United States. 367 F.3d at 1090. Emphasizing that § 1326 is not a strict liability offense, the Ninth Circuit nonetheless held that "alleging a defendant is a deported alien who is subsequently found in the United States without permission suffices to allege general intent" because a person physically present in the United States may be presumed to have acted to enter in this country. Id. (Internal citations omitted). Accordingly, the grand jury could infer, and give its approval to, the *mens rea* requirements that the defendant knew he was in the United States and entered voluntarily.

Importantly, Rivera Sillas did not address whether the indictment must allege a defendant's knowledge of his alienage. Moreover, while the allegation that the defendant is a "deported alien who is subsequently found in the United States without permission" gives rise to an inference that the defendant knew he was in the United States and voluntarily entered, the same language does not lead to an inference that the defendant knew he was a non-citizen. The fact of an defendant's removal does not establish his alienage, much less his knowledge of alienage.[12] E.g. United States v. Ortiz-Lopez, 24 F.3d 53, 56 (9th Cir. 1994) (quote). Indeed, a defendant's alienage is never really evaluated in many–if not most–removal proceedings, either because the respondent is unrepresented and unable to evaluate his citizenship, does not want to remain in custody while contesting the allegations in the order to show cause, has agreed to removal as part of a plea agreement entered into with insufficient information, or does not yet know the facts that make him a United States citizen. Accordingly, unless the government presents some evidence to the grand jury in addition to the fact of a removal–evidence that may, but need not, come from the removal proceeding–the grand jury has no way to evaluate the defendant's knowledge of his own alienage.[13]

**C. Failure to allege date of deportation, or its temporal relationship to a removal**

Mr. Estrada-Jimenez has a Fifth Amendment right to have a grand jury pass upon those facts necessary to convict him at trial. In the indictment, the government included the language: "It is further alleged that defendant MARCO ANTONIO Estrada-Jimenez was removed from the United States subsequent to November 21, 2005."[14] The indictment in this case violates Mr. Estrada-

---

[12] Indeed, an Immigration Judge does not adjudicate alienage, though she may terminate proceedings based on evidence of citizenship.

[13] The facts of United States v. Staples illustrate the limits of the presumptions relied upon in Rivera-Sillas. To date, no court has read Staples to permit a presumption that a defendant knew the particular characteristics bringing the firearm within the scope of the statute simply because he possessed it.

[14] Presumably, the government added this language in an attempt to comply with the Ninth Circuit's decision in United States v. Covian-Sandoval, 462 F.3d 1090 (9th Cir. 2006). In Covian-Sandoval, the Ninth Circuit held that it is an Apprendi violation for a court to increase a person's statutory maximum under 8 U.S.C. § 1326(b) via a court-finding that a person had been removed from the United States following a conviction. This language, however, does not cure the problems with this indictment.

Jimenez's right to presentment in two ways. First, the language added by the government does not ensure that the grand jury actually found probable cause that Mr. Estrada-Jimenez was deported after November 21, 2005, as opposed to simply being physically removed from the United States. Second, that the grand jury found probable cause to believe that Mr. Estrada-Jimenez was removed "subsequent to November 21, 2005" does not address the possibility that the government may at trial rely on a deportation that was never presented to, or considered by, the grand jury.

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. Amend. V. The Sixth Amendment provides that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . .." U.S. Const. Amend. VI. Thus, a defendant has a constitutional right to have the charges against him presented to a grand jury and to be informed of the grand jury's findings via indictment. See Russell, 369 U.S. at 763 (An indictment must "contain[] the elements of the offense intended to be charged, and sufficiently apprise[] the defendant of what he must be prepared to meet.").

To be sufficient, an indictment must allege every element of the charged offense. See United States v. Morrison, 536 F.2d 286, 287 (9th Cir. 1976) (citing United States v. Debrow, 346 U.S. 374 (1953)). Indeed, in order to be sufficient, an indictment must include implied elements not present in the statutory language. See Du Bo, 186 F.3d at 1179. "If an element is necessary to convict, it is also necessary to indict, because elements of a crime do not change as criminal proceedings progress." United States v. Hill, 279 F.3d 731, 741 (9th Cir. 2002). An indictment's failure to "recite an essential element of the charged offense is not a minor or technical flaw . . . but a fatal flaw requiring dismissal of the indictment." Du Bo, 186 F.3d at 1179.

In the indictment, the government here has added the language: "It is further alleged that defendant CARLOS ESTRADA-JIMENEZ was removed from the United States subsequent to April 2, 1992." There is no indication from this "allegation" that the grand jury was charged with the legal meaning of the word "removal" applicable in this context, as opposed to being simply removed from the United States in a colloquial sense. It is clear from Covian-Sandoval that in order to trigger the enhanced statutory maximum contained in section 1326(b), the government must prove that a person

was removed—as that term is used in the immigration context—after having suffered a conviction. 462 F.3d at 1097-1098 (noting as part of its analysis that immigration proceedings have fewer procedural protections that criminal proceedings). A deportation has the following elements: "(1) that a deportation proceeding occurred as to [the] defendant and as a result, [(2)] a warrant of deportation was issued and [(3)] executed by the removal of the defendant from the United States." See United States v. Castillo-Basa, 483 F.3d 890 (9th Cir. 2007) (citing, without contesting, the elements of a deportation provided by the district court.) As this is the type of removal the government must prove before a petite jury, it is necessary that the government allege such a removal before the grand jury. As returned, however, there is no assurance from the face of the indictment that the grand jury in this case was charged with the type of removal necessary to increase a person's statutory maximum under section 1326(b).

As such, there is no fair assurance that the grand jury will have passed upon those facts necessary to convict Mr. Estrada-Jimenez. Additionally, as charged, there is no fair assurance that the indictment will contain those allegations the government will attempt to prove at trial. If the government alleged before the grand jury that Mr. Estrada-Jimenez was removed (in a colloquial sense), but offers proof at trial that Mr. Estrada-Jimenez was removed (in an immigration sense), there will be a constructive amendment of the indictment at trial. See Stirone v. United States, 361 U.S. 212, 217-19 (1960). Either scenario represents a violation of Mr. Estrada-Jimenez's right to presentment. Stirone, 361 U.S. at 218-19.

A second problem with the indictment is that there is no indication which (if any) deportation the government presented to the grand jury. In most cases, the government will have a choice of deportations to present to the grand jury to support an allegation that a person had been deported after a specific date. According to information provided by the government, although not conceded by the defendant, Mr. Estrada-Jimenez has been deported on several occasions. This renders it a very real possibility that the government alleged one deportation to the grand jury to sustain its allegation that Mr. Estrada-Jimenez was removed from the United States, but will attempt to prove at trial a wholly different deportation to sustain its trial proof. If this were to turn out to be the case,

Mr. Estrada-Jimenez's right to have the grand jury pass on all facts necessary to convict him would be violated. See Du Bo, 186 F.3d 1179.

**D. Failure to allege a prior conviction**

Although purportedly alleging a violation of sub-section (b) of section 1326, the indictment here does not allege that Mr. Estrada-Jimenez has suffered a prior conviction. Mr. Estrada-Jimenez moves to dismiss the indictment on this basis. Mr. Estrada-Jimenez recognizes that Ninth Circuit law is contrary to his position. See Covian-Sandoval, 462 F.3d at 1096-98. He nonetheless raises the issue to preserve his requested remedy—dismissal based on structural error. See United States v. Salazar-Lopez, No. 06-50438, __ F.3d __ (9th Cir. Oct. 24, 2007), available as 2007 U.S. App. Lexis 24788 *1, *8-*14.

**V.**

**MOTION TO STRIKE SURPLUSAGE**

The above arguments to dismiss the indictment based on the government's failure to comply with Mr. Estrada-Jimenez's Fifth and Sixth Amendment rights is premised on Covian-Sandoval having read into section 1326 an additional element—a deportation that occurred at a particular time—that the government must plead to the grand jury and prove to a jury. To the extent the government argues that Covian-Sandoval did not create an additional element, the indictment contains surplusage. In other words, if the government argues that the timing of a person's deportation is not a element of section 1326, but rather a sentencing factor under subsection (b) of section 1326, the indictment alleges a fact—the timing of a person's deportation—the Supreme Court has clearly held to be decided by a judge.

The Ninth Circuit has "repeatedly held that language [in an indictment] that describes elements beyond what is required under statute is surplusage and need not be proved at trial." Bargas v. Burns, 179 F.3d 1207, 1216 n. 6 (9th Cir. 1999). Surplusage in an indictment is subject to being struck at the request of the defendant. United States v. Fernandez, 388 F.3d 1199, 1220-21 (9th Cir. 2004). In this case, if the government argues that the date of a person's deportation is not a required element of section 1326, the indictment contains language beyond that which is necessary to convict Mr. Estrada-Jimenez of violating section 1326. If the date of a person's deportation is not

an element of section 1326, then the language in the indictment—" "It is further alleged that defendant MARCO ANTONIO Estrada-Jimenez, was removed from the United States subsequent to November 21, 2005."—is surplusage. So too is the government's allegation in the indictment that Mr. Estrada-Jimenez violated section 1326, subsection (b).

At one time, the Ninth Circuit considered subsection (b) of section 1326 a separate offense from subsection (a). See United States v. Corona-Sanchez, 291 F.3d 1201, 1203 (9th Cir. 2002) (*en banc*). This changed, however, following the Supreme Court's decision in Almendarez-Torres v. United States, 523 U.S. 224 (1998). See Corona-Sanchez, 291 F.3d at 1203. In Almendarez-Torres, the Supreme Court decided that subsection (b) of section 1326 described a sentencing provision, to be determined by a judge, rather than a substantive offense. See id. Following Almendarez-Torres, the Ninth Circuit rethought the way in which subsection (b) should be viewed, to the extent that indictments and judgements that reflect a violation of both subsection (a) and subsection (b) of section 1326 should have the reference to subsection (b) struck to "unambiguously reflect that the defendant was convicted of only one punishable offense pursuant . . .." Id.

Although an allegation of a particular date of deportation would likely be an appropriate response on the government's part to the holding of Covian-Sandoval, the government here has chosen to include in the indictment an allegation that goes solely towards an allegation under subsection (b) of section 1326. Indeed, the government has chosen to actually allege a violation of subsection (b) of section 1326 in the indictment. As Almendarez-Torres makes clear, however, Congress clearly intended findings under subsection (b) of section 1326 to made by a judge, rather than a jury. Almendarez-Torres, 523 U.S. at 235 ("we believe that Congress intended to set forth a sentencing factor in subsection (b)(2) and not a separate criminal offense).

Although the Ninth Circuit is free to overrule its own precedent regarding whether Congress intended a statutory provision to be decided by a judge, rather than a jury, see, e.g., United States v. Buckland, 289 F.3d 558, 564-68 (9th Cir. 2002) (*en banc*) (discussing enhanced penalties under 21 U.S.C. § 841), it has not seen fit to overrule the Supreme Court's decision in Almendarez-Torres. See, e.g., United States v. Weiland, 420 F.3d 1062, 1079 n. 16 (9th Cir. 2005). For these reasons,

to the degree the government argues that Covian-Sandoval did not create an additional element of section 1326, the government has pled in the indictment an allegation that Congress intended to be decided by judge, rather than a jury.[15] Therefore, pursuant to Federal Rule of Criminal Procedure 7(d), Mr. Estrada-Jimenez moves to strike this surplusage from the indictment.

**VI.**

**MOTION TO PRODUCE GRAND JURY TRANSCRIPTS**

Mr. Estrada-Jimenez moves this Court to compel the government to produce all grand jury transcripts in this case. See U.S. CONST. AMENDS V & VI[16]. Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) allows disclosure "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Given the arguments raised above, it is clear that "a ground may exist to dismiss the indictment because of a matter that

---

[15] The holdings in Covian-Sandoval and Almendarez-Torres also render subsection (b) of section 1326 unconstitutional. In Covian-Sandoval, the Ninth Circuit held that a jury must determine the timing of a person's deportation to trigger subsection (b)'s enhanced statutory maximum. Covian-Sandoval, 462 F.3d 1097-1098. In Almendarez-Torres, however, the Supreme Court held that Congress intended subsection (b) to be a sentencing provision to be determined by a judge. Almendarez-Torres, 523 U.S. at 235. It is thus clear that subsection (b), as written and construed by the Supreme Court, violates Apprendi.

[16] The Supreme Court has found that "[t]he grand jury is an integral part of our constitutional heritage which was brought to this country with the common law. The Framers, most of them trained in the English law and traditions, accepted the grand jury as a basic guarantee of individual liberty . . . the grand jury continues to function as a barrier to reckless or unfounded charges. 'Its adoption in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice.' Costello v. United States, 350 U.S. 359, 362 (1956). Its historic office has been to provide a shield against arbitrary or oppressive action, by insuring that serious criminal accusations will be brought only upon the considered judgment of a representative body of citizens acting under oath and under judicial instruction and guidance. " United States v. Manduano, 425 U.S. 564, 571 (1976). In order to ensure that the criminally accused are safeguarded from reckless and unfounded charges, judges must take their duty to provide guidance seriously and not simply pay lip service to the assurances of the government. It is curious why the government, in this district in particular, fights so hard to keep grand jury proceedings sealed. Interestingly, in many cases, the "witness" who "testifies" before the grand jury is a border patrol agent who neither participated in the arrest or the investigation. He is only called to read a report which has been prepared by others. Such a practice does not allow for the considered judgment of grand jurors. Thus, the release of transcripts is appropriate.

occurred before the grand jury." Fed. R. Crim. P 6(e)(3)(E)(ii). Mr. Estrada-Jimenez requests the Court "authorize disclosure" of the grand jury transcript to allow Mr. Estrada-Jimenez to adequately prepare for trial and to perfect his appellate record. See id.

## VII.

## MOTION TO SUPPRESS STATEMENTS

Mr. Estrada-Jimenez moves to suppress his statements on the grounds of an invalid Miranda waiver and voluntariness.

### A. The Government Must Demonstrate Compliance with *Miranda*.

In order for any statements made by Mr. Estrada-Jimenez to be admissible against him, the government must demonstrate that they were obtained in compliance with the Miranda decision. The government must establish that Mr. Estrada-Jimenez' waiver of his Miranda rights was voluntary, knowing, and intelligent. See Schneckloth v. Bustamonte, 412 U.S. 218 (1973). When interrogation continues without the presence of an attorney, and a statement results, the government has a heavy burden to demonstrate that the defendant has intelligently and voluntarily waived his privilege against self-incrimination. Miranda, 384 U.S. at 475. The court must indulge every reasonable presumption against waiver of fundamental constitutional rights, so the burden on the government is great. United States v. Heldt, 745 F. 2d 1275, 1277 (9th Cir. 1984).

In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the totality of the circumstances surrounding the case. Edwards v. Arizona, 451 U.S. 477 (1981); United States v. Garibay, 143 F.3d 534 (9th Cir. 1998). The Ninth Circuit has held that determination of the validity of a Miranda waiver requires a two prong analysis: the waiver must be both (1) voluntary and (2) knowing and intelligent. Derrick v. Peterson, 924 F. 2d 813 (9th Cir. 1990). The second prong requires an inquiry into whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Id. at 820-821 (quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)). Not only must the waiver be uncoerced, then, it must also involve a "requisite level of comprehension" before a court may conclude that Miranda rights have been legitimately waived. Id. (quoting Colorado v. Spring, 479 U.S. at 573). Unless and until Miranda warnings and a knowing and intelligent waiver are

demonstrated by the prosecution, no evidence obtained as a result of the interrogation can be used against the defendant. Miranda, 384 U.S. at 479. The government in this case must prove that Mr. Estrada-Jimenez waived his rights intelligently and voluntarily. Mr. Estrada-Jimenez disputes any allegation any waiver was knowing, intelligent, and voluntarily.

**B. Mr. Estrada-Jimenez's Statements Must Be Voluntary.**

Even if this Court determines that Mr. Estrada-Jimenez validly waived his Miranda rights, it must still make a determination that any statements are voluntary. Under 18 U.S.C. § 3501(a), this Court is required to determine, whether any statements made by Mr. Estrada-Jimenez are voluntary. In addition, section 3501(b) requires this Court to consider various enumerated factors, including whether Mr. Estrada-Jimenez understood the nature of the charges against him and whether he understood his rights. Without such evidence, this Court cannot adequately consider these statutorily mandated factors. Moreover, section 3501(a) requires this Court to make a factual determination. Where a factual determination is required, Fed. R. Crim. P. 12 obligates courts to make factual findings. See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.

## VIII.

## MOTION FOR LEAVE TO FILE FURTHER MOTIONS

Mr. Estrada-Jimenez has received fifty-eight pages of discovery. He requests leave to file further motions if necessary.

## IX.

## CONCLUSION

Mr. Estrada-Jimenez requests this Court grant his motions.

Respectfully submitted,

Dated: December 14, 2007

/s/ Robert H. Rexrode
**ROBERT H. REXRODE, III**
Attorney for Mr. Estrada-Jimenez
robert_rexrode@rexrodelawoffices.com